1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

11

12

13

14

15

| | |
|---|---|
| ASSOCIATION SERVICES OF WASHINGTON, INC., | CASE NO. C21-0427JLR |
| Plaintiff, | ORDER |
| v. | |
| WESTERN METAL INDUSTRY PENSION FUND, et al., | |
| Defendants. | |

16

## I.    INTRODUCTION

17

Before the court are (1) Plaintiff Association Services of Washington, Inc.'s

18

("ASW") motion for summary judgment (Pl. MSJ (Dkt. # 14)); and (2) Defendants the

19

Western Metal Industry Pension Trust (the "Trust") and the Board of Trustees of the

20

Trust's (collectively, "Defendants") cross motion for summary judgment (Defs. MSJ

21

(Dkt. # 12)). Each opposes the other's motion. (*See* Pl. MSJ Resp. (Dkt. # 16); Defs.

22

MSJ Resp. (Dkt. # 17).) The court has considered the motions, the parties' submissions

1  in support of and in opposition to the motions, the relevant portions of the record, and the

2  applicable law. Being fully advised,[1] the court DENIES ASW's motion and GRANTS

3  Defendants' motion.

## II. BACKGROUND

5      ASW brings this case under the Employment Retirement Income Security Act

6  ("ERISA"), 29 U.S.C. § 1001 *et seq.* (1988), to vacate an arbitration decision and award

7  issued by Arbitrator Elliot H. Shaller. (Compl. (Dkt. # 1) ¶ 1.) The court first reviews

8  the relevant statutory scheme before summarizing the factual background of this case.

**A. Statutory Scheme**

10     Pension plans are federally regulated pursuant to ERISA. *See Carpenters Pension*

11 *Tr. Fund for N. Cal. v. Underground Constr. Co., Inc.*, 31 F.3d 776, 778 (9th Cir. 1994).

12 This case additionally concerns several subsequent statutes that have amended portions of

13 ERISA to aid underfunded pension plans. As applicable here, the court reviews the

14 statutes governing withdrawal liability upon an employer's withdrawal from the plan and

15 rehabilitation plans to aid struggling plans.

16     1. Withdrawal Liability

17     Congress enacted the Multiemployer Pension Plan Amendments Act of 1980

18 ("MPPAA"), 29 U.S.C. §§ 1381-1453 (1988), to amend ERISA and set forth that

19 employers cannot withdraw from multiemployer pension plans without consequence. *See*

20 *//*

21     [1] ASW requests oral argument (*see* Pl. MSJ at 1; Defs. MSJ at 1), but the court
22 determines that oral argument would not be helpful to its disposition of the motions, *see* Local
Rules W.D. Wash. LCR 7(b)(4).

29 U.S.C. § 1381(a).  The MPPAA allows plans to impose liability on withdrawing employers by making them pay their proportionate share of the resulting deficit so that the remaining contributors would not be unfairly saddled with increased payments.  *See id.*; *see also ILGWU Nat'l Ret. Fund v. Levy Bros. Frocks, Inc.*, 846 F.2d 879, 880 (2d Cir. 1988) (stating that MPPAA's "primary purpose" is to "protect retirees and workers . . . against the loss of their pensions" by setting up withdrawal liability that "relieve[s] the funding burden on remaining employers and . . . eliminate[s] the incentive to pull out of a plan").

Withdrawal liability is assessed on an employer who exercises a "complete withdrawal" from a plan.  29 U.S.C. § 1381(a).  A "complete withdrawal" occurs when an employer "(1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan." *Id.* § 1383(a).  An "obligation to contribute" is, in turn, defined as one "arising . . . (1) under one or more collective bargaining (or related) agreements, or (2) as a result of a duty under applicable labor-management relations law." *Id.* § 1392(a).  When an employer completely withdraws, the plan sponsor must notify the employer of the amount of withdrawal liability due.  *Id.* §§ 1382, 1399(b)(1).  In short, the employer incurs its "proportionate share of the plan's 'unfunded vested benefits,'" which is calculated "as the difference between the present value of vested benefits and the current value of the plan's assets." *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 725 (1984).

The employer may make a onetime payment to satisfy the entire withdrawal liability, or it may amortize the debt in equal annual payments.  *See* 29 U.S.C.

1    § 1399(c)(1)(A).  If the employer elects to amortize the debt, the plan must prepare a

2    schedule for those annual liability payments.  *Id.* §§ 1382, 1399(b)(1).  Annual payments

3    are capped at 20 years, or 80 quarterly payments, even if more than 20 annual payments

4    would be required to completely satisfy the withdrawal liability.  *Id.* § 1399(c)(1)(B).

5    The amount of each annual payment is the product of two numbers:  (1) the "average

6    annual number of contribution base units"—usually calculated off of payroll—for the

7    highest three-year period during the ten years preceding the withdrawal; and (2) the

8    highest contribution rate ("HCR") that the employer had to contribute at during that

9    ten-year period.  *See id.* § 1399(c)(1)(C)(i).

10        2.  Rehabilitation Plans

11        Congress amended ERISA again in 2006 by enacting the Pension Protection Act

12    ("PPA"), a "far-reaching" law with "a number of mechanisms aimed at stabilizing

13    pension plans and ensuring that they remain solvent."  *Trs. Of Local 138 Pension Tr.*

14    *Fund v F.W. Honerkamp Co. Inc.*, 692 F.3d 127, 130 (2d Cir. 2012).  One such

15    mechanism was the designation of plans in danger of not meeting their future pension

16    distribution obligations as in "critical status," which triggers various protections.  29

17    U.S.C. § 1085(b)(2).  Plans in "critical status" must notify the bargaining parties[2] and

18    adopt a plan that presents one or more options for rehabilitation, such as reducing

19    benefits or increasing contributions, to enable the plan to emerge from critical status.  *Id.*

20    § 1085(e)(3)(A).  A "bargaining party" includes an employer that contributes to a

21

22        [2] Bargaining parties are generally entities who are contributing to the plan or employee
organizations who represent participants of the plan.  *See* 29 U.S.C. §§ 1085(j)(1), 1085(i)(2).

1   multiemployer plan only with respect to employees who are not covered by a collective

2   bargaining agreement ("CBA").  *See id.* § 1085(i)(2).

3       The rehabilitation plan must set forth one or more schedules showing revised

4   benefit structures, revised contribution schedules, or both, that it presents to bargaining

5   parties for them to choose from.  *Id.* § 1085(e); *see F.W. Honerkamp*, 692 F.3d at 131.

6   One of these schedules, designated as the "default schedule," will assume that there are

7   no increases in contributions other than the increases necessary to emerge from critical

8   status.  29 U.S.C. § 1085(e)(1)(B).  If the bargaining parties fail to adopt one of the

9   schedules by a designated time, then the plan shall implement the default schedule.  *Id.*

10  § 1085(e)(3)(C).  Additionally, the PPA imposes an automatic surcharge, starting from 30

11  days after the bargaining parties have been notified of the critical status until the adoption

12  of a new contribution agreement in accordance with the rehabilitation plan.  *Id.*

13  § 1085(e)(7)(C)-(D).  In the first year, the surcharge is five percent of the contributions,

14  and in subsequent years, the surcharge increases to 10 percent of the contributions.  *Id.*

15  § 1085(e)(7)(A).

16      In 2014, Congress amended the PPA with the Multiemployer Pension Reform Act

17  ("MPRA").  Pub. L. No. 1130235, Div. O, 128 Stat. 2130, 2773-2822.  As relevant here,

18  the MPRA provided that "[a]ny increase in the contribution rate . . . that is required or

19  made in order to enable the plan to meet the requirement of the . . . rehabilitation plan

20  shall be disregarded in determining . . . the [HCR]."  29 U.S.C. § 1085(g)(3)(A).  The

21  MPRA provided the same for surcharges, stating that "[a]ny surcharges . . . shall be

22  disregarded in determining . . . the [HCR]."  *Id.* § 1085(g)(2).  This amendment does not

1 | affect any increased contribution rate pursuant to a rehabilitation plan or surcharges

2 | accrued before December 31, 2014.

3 | **B.    Factual Background**

4 | The court reviews ASW's participation in the Trust; ASW's eventual termination

5 | of its contributions and the Trust's liability calculations; and the arbitration proceedings.

6 | 1.   <u>ASW's Participation in the Trust</u>

7 | The Trust is a multiemployer pension fund subject to ERISA and governed by its

8 | Trust Agreement.  (Roller Decl. (Dkt. # 15) ¶ 6, Ex. D ("Trust Agreement") at 7-8.)[3]  The

9 | Trust accepts contributions from "participating employer associations," which is defined

10 | by the Trust Agreement as "any employer association that is party to a [CBA] with a

11 | labor organization."  (*Id.* at 9, 16-18.)  The Trust may enter into a "special agreement"

12 | with a participating employer association, by which the participating employer

13 | association contributes to the Trust in exchange for employee coverage.  (*Id.* at 17.)  The

14 | Trust Agreement also provides that in the event "a participating employer should

15 | withdraw from the Trust Fund, the Board of Trustees shall . . . determine the amount of

16 | the employer's withdrawal liability (if any)."  (*Id.* at 34.)

17 | On April 15, 2008, ASW, a non-profit association of employers engaged in the

18 | metal industry, entered into a "Special Agreement Providing for Coverage of Employees

19 |

20 | [3] The Trust also submits the Trust Agreement, as well as many of the other documents relied upon by the court, as support for its cross motion.  (*See, e.g.*, Lash Decl. (Dkt. # 13) ¶ 3,

21 | Ex. 2 (Trust Agreement); *id.* ¶ 4, Ex. 3 (2008 Special Agreement); *id.* ¶ 6, Ex. 5 (2011 Special Agreement); *id.* ¶ 7, Ex. 6 (Demand Letter); *id.* ¶ 12, Ex. 11 (Arbitration Award); *id.* ¶ 5, Ex. 4

22 | (Rehabilitation Plan).)  For these duplicate submissions, the court cites generally to the document title.

1    of Employer Associations" (the "2008 Special Agreement") with the Trust.  (Roller Decl.

2    ¶ 3, Ex. A-1 ("2008 Special Agreement"); *id.* ¶ 4, Ex. B ("Arb. Award") at 1.)  Although

3    ASW has engaged in collective bargaining on behalf of its members, its employees are

4    not in a collective bargaining relationship.  (Arb. Award at 1.)  The 2008 Special

5    Agreement recognized the Trust's ability to provide "coverage [for] employees of

6    bonafide employer associations actively engaged in multi-employer collective bargaining

7    negotiations."  (2008 Special Agreement at 1.)  As such, ASW agreed to "pay pension

8    contributions . . . on behalf of all of its regular employees at the rate of 6% of gross

9    compensation" and to "abide by . . .        the Trust Agreement governing the Trust."  (*Id.*)

10        In 2010, the Trust's actuary certified to the U.S. Department of the Treasury that

11    the Trust was in critical status, as it was "projected to have a funding deficiency."  (Roller

12    Decl. ¶ 1, Ex. A-4 ("Rehab. Plan") at 1.)  Because the Trust was in critical status, it

13    developed a rehabilitation plan and offered two schedules for bargaining parties to choose

14    between:  a Preferred Schedule and a Default Schedule.  (*Id.*)  The Preferred Schedule

15    reduced some benefits and increased employer contribution rates on an escalating basis.

16    (*Id.* at 2.)  The Default Schedule did not reduce benefits but increased employer

17    contribution rates more dramatically.  (*Id.*)

18        ASW adopted the Preferred Schedule, and the change to its contribution rates was

19    reflected in its 2011 Special Agreement with the Trust.  (*See* Roller Decl. ¶ 1, Ex. A-2

20    ("2011 Special Agreement") at 2.)  ASW agreed to "pay an additional supplemental

21    contribution in an amount equal to 16% of the previously established [6%] contribution

22    rate" and acknowledged that "[t]his supplemental rate increases from 16% in the first

ORDER - 7

1   year to 32% in the second year, to 48% in the third year, etc." (*Id.*)  In other words,

2   ASW's contribution rates would increase to 6.96% the first year, 7.92% second year,

3   8.88% the third year, etc.  (*See id.*)

4       2.  <u>ASW's Termination of Contributions</u>

5         In 2017, ASW terminated its contributions to the Trust.  (*See* Roller Decl. ¶ 1, Ex.

6   A-5 ("Demand Letter") at 1.)  The Trust assessed withdrawal liability and sent ASW a

7   demand on January 29, 2019, for $36,364,828, or 80 quarterly payments of $137,540.

8   (*Id.*)  To calculate the annual payment amount, the Trust multiplied two numbers:

9   (1) ASW's average payroll in the highest three consecutive years during the ten years

10  preceding the withdrawal, or $5,941,274; and (2) ASW's HCR from the Preferred

11  Schedule, or 9.26%.  (*Id.* at 3).

12        ASW submitted a request for review of the withdrawal liability assessment on

13  March 11, 2019.  (Lash Decl. ¶ 9, Ex. 8 at 1-2.)  Specifically, ASW first argued that it

14  had not made a "complete withdrawal" from the Trust under § 1383(a).  (*Id.* at 1.)  ASW

15  reasoned that it did not have the requisite "obligation to contribute" to the fund because

16  its obligation arose under a Special Agreement, not a "collective bargaining (or related)

17  agreement." (*Id.*); *see* 29 U.S.C. § 1392(a)(1).  Even if it had such an obligation, ASW

18  next challenged the Trust's identified HCR of 9.26%, arguing that the contributions under

19  the rehabilitation plan should not be included.  (*Id.*)  Specifically, ASW asserted that the

20  higher contribution rates under the Preferred Schedule arises from statute rather than a

21  collective bargaining or (related) agreement and thus must be excluded under the

22  definition set out in § 1392(a)(1).  (*Id.*)  On August 6, 2019, the Trust denied ASW's

1    request for review and informed ASW that it would not be modifying its original

2    assessment.  (Lash Decl. ¶ 10, Ex. 9 at 1-4.)

3         3.  Arbitration Proceedings

4         On August 28, 2019, ASW initiated arbitration proceedings with the American

5    Arbitration Association to dispute the Trust's determination of withdrawal liability.

6    (Lash Decl. ¶ 11, Ex. 10 at 1-2.)  After full briefing from the parties, Arbitrator Shaller

7    issued an award on March 1, 2021, upholding the Trust's determinations.  (Arb. Award at

8    8, 27-28.)  First, on the issue of whether ASW made a "complete withdrawal," Arbitrator

9    Shaller concluded that ASW had an "obligation to contribute" to the Trust due to the

10   Special Agreement, which Arbitrator Shaller qualified as a "related" agreement within

11   the meaning of § 1392(a)(1).  (*Id.* at 28-36.)  Although ASW "itself is not a party to a

12   [CBA] covering its staff employees," Arbitrator Shaller noted that "the Special

13   Agreement is 'related' to a CBA, namely the Trust Agreement," which was "the product

14   of negotiations between employer and union representatives on a term and condition of

15   employment for bargaining unit employees."  (*Id.* at 30.)

16        Arbitrator Shaller further found that the increased contribution rates as proffered

17   by the Preferred Schedule originated from ASW's 2011 Special Agreement, which is a

18   related agreement under § 1392(a)(1).  (*Id.* at 40.)  Because this obligation to contribute

19   arose from a related agreement rather than from ERISA's statutory requirements, it was

20   properly included in the calculation of the HCR.  (*Id.* at 37, 40-48.)  In reaching this

21   conclusion, Arbitrator Shaller leaned heavily on a recent district court case, *Board of*

22   *Trustees of the Western States Office and Professional Employees Pension Fund, et al. v.*

1  *International Brotherhood of Electrical Workers Local 483, et al.*, 506 F. Supp. 3d 1078

2  (D. Or. Dec. 11, 2020) ("*WSOPE*"), which found that increased contributions resulting

3  from the parties' adoption of a rehabilitation contribution rate in a CBA is properly

4  included in an HCR calculation.  (*See id.* at 38-48); *WSOPE*, 506 F. Supp. at 1080.

5        Accordingly, Arbitrator Shaller concluded that the Trust "did not err in finding

6  that ASW had withdrawal liability and in determining that 9.26% of compensation is the

7  applicable HCR for purposes of calculating ASW's annual withdrawal liability payment."

8  (*Id.* at 48.)  He denied ASW's claims in their entirety.  Pursuant to 29 U.S.C.

9  § 1401(b)(2), ASW initiated this district court action to vacate or modify Arbitrator

10  Shaller's award.  *See* 29 U.S.C. § 1301(b)(2); (Compl. ¶¶ 21-24.)

11                      **III.    ANALYSIS**

12        "The clear authorization of 29 U.S.C. § 1401(b)(2) for judicial review 'to enforce,

13  vacate, or modify the arbitrator's award' gives [the] court a right to review an arbitrator's

14  legal rulings."  *Trs. Of Amalgamated Ins. Fund v. Geltman Indus., Inc.*, 784 F.2d 926,

15  928 (9th Cir. 1986).  In an action to vacate or modify an arbitrator's award, the

16  arbitrator's factual findings are entitled to deference but questions of law are reviewed *de*

17  *novo*.  *Bd. of Tr. of W. Conf. of Teamsters Pension Tr. Fund v. Thompson Bldg.*

18  *Materials, Inc.*, 749 F.2d 1396, 1406 (9th Cir. 1984).  Statutory interpretation "is a

19  question of law subject to *de novo* review."  *Geltman*, 784 F.2d at 928.

20        As in the arbitration proceedings, ASW challenges two aspects of the Trust's

21  determination of withdrawal liability.  First, ASW argues that the Trust's assessment of

22  withdrawal liability is improper because it "could not have effected a 'complete

1    withdraw' [as] it had no 'obligation to contribute' to the [Trust]."  (Pl. MSJ at 1, 6-18.)

2    Second, ASW contends that even if it incurred withdrawal liability, its rehabilitation

3    contribution rate was improperly included as the HCR.  (*Id.* at 1, 18-36.)  Defendants

4    maintain that both determinations were correct, as affirmed by Arbitrator Shaller.  (Defs.

5    MSJ at 12-36.)  The court addresses each issue in turn.

6    **A.    Assessment of Withdrawal Liability**

7            As described above, withdrawal liability is assessed upon a "complete

8    withdrawal," which occurs when an employer "(1) permanently ceases to have an

9    obligation to contribute under the plan, or (2) permanently ceases all covered operations

10   under the plan."  29 U.S.C. §§ 1381(a), 1383(a).  The parties agree that only the first

11   prong is relevant here.  (*See* Pl. MSJ at 4; Defs. MSJ at 14.)  An "obligation to

12   contribute" is, in turn, defined as one "arising . . . (1) under one or more collective

13   bargaining (or related) agreements, or (2) as a result of a duty under applicable

14   labor-management relations law."  29 U.S.C. § 1392(a).  Again, the parties agree that

15   only the first part of the definition is at issue here.  (*See* Pl. MSJ at 6; Defs. MSJ at

16   14-15.)  The parties further agree that the Special Agreement giving rise to ASW's

17   contributions to the Trust is not itself a CBA.  (*See* Pl. MSJ at 14-15; Defs. MSJ at

18   14-21.)  Accordingly, the parties' dispute is a narrow one:  whether the Special

19   Agreement qualifies as a "related" agreement under § 1392(a).

20           This statutory interpretation question centers on the definition of "related" and

21   what it refers to—that is, what a qualifying agreement must be related to.  *See* 29 U.S.C.

22   § 1392(a).  ASW contends that any qualifying agreement must be related to a CBA,

1    whereas Defendants advocate that a qualifying agreement need only be related to an

2    organization's obligation to contribute.  (Pl. MSJ at ; Defs. MSJ at 16-17.)  On this

3    question, the court agrees with ASW.

4           The court's statutory interpretation analysis begins, as it must, with the statute's

5    plain language.  *See Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S.

6    238, 254 (2000).  The court gives the language its plain and ordinary meaning.  *Park 'N*

7    *Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985).  Words "are to be given

8    the meaning that proper grammar and usage would assign them," and the "rules of

9    grammar govern statutory interpretation unless they contradict legislative intent or

10   purpose.  *Nielsen v. Preap*, 139 S. Ct. 954, 965 (2019) (quoting A. Scalia & B. Garner,

11   Reading Law, The Interpretation of Legal Texts 140 (2012)) (internal quotation marks

12   omitted).  When the language is clear, it will be given effect without resort to other aids

13   of construction.  *Id.*; *see also Lake Cnty. v. Rollins*, 130 U.S. 662, 670 (1889) ("[T]he first

14   resort, in all cases, is to the natural signification of the words, in the order of grammatical

15   arrangement in which the framers of the instrument have placed them.").

16          Here, the placement and surrounding context of the parenthetical phrase "(or

17   related)" indicates that a qualifying agreement must be related to a CBA.  *See* 29 U.S.C.

18   § 1392(a).  First, the placement of the parenthetical phrase right after "collective

19   bargaining" strongly indicates that it is referring back to the phrase immediately

20   preceding it.  *See id.*; *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 466 (2001) (giving

21   words content by their surroundings).  Moreover, the principle of *ejusdem generis*, which

22   provides that "a general term following more specific terms means that the things

1  embraced in the general term are of the same kind of those denoted by the specific

2  terms," counsels that the general term here—"or related"—refers to the specific term

3  before it—"collective bargaining." *See United States v. Baird*, 85 F.3d 450, 453 (9th Cir.

4  1996). Lastly, to adopt the Trust's proposed interpretation that "or related" refers to any

5  agreement setting out an obligation to contribute would effectively render the phrase

6  "collective bargaining" superfluous, as any agreement would necessarily include a CBA

7  without Congress having to specify so. The court is "reluctant to treat statutory terms as

8  mere surplusage."[4] *Microsoft Corp. v. C.I.R.*, 311 F.3d 1178, 1184 (9th Cir. 2002).

9        Defendants' main support for their broad reading is that "[t]his interpretation is

10  consistent with the aims of the MPPAA." (Defs. MSJ at 17; *see also id.* at 16 ("The more

11  reasonable interpretation, in light of the MPPAA's purpose, is that the phrase 'or related

12  . . .' references the phrase 'obligation to contribute.'").) The court does not contest that

13  reading "or related" broadly would extend the reach of withdrawal liability, and the court

14  further acknowledges the relevance of the statute's purpose in ERISA cases. *See Korea*

15  *Shipping Corp. v. NYSA-ILA Pension Tr. Fund*, 880 F.2d 1531, 1537 (2d Cir. 1989). But

16  such "naked policy appeals" suggesting that the court "proceed without the law's

17  guidance to do as we think best" is "an invitation no court should ever take up." *Bostock*

18  *v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1753 (2020). It is not for the court to "make new

19  legislation, or address unwanted consequences of old legislation," especially when the

20  //

21       [4] Because the court agrees with ASW's reading of what "related" refers to, it does not
address ASW's supporting argument that reading "related" as the Trust proposes would render

22  another section, 29 U.S.C. § 1085(i)(2), superfluous. (*See* Pl. MSJ at 15-17.)

plain language indicates otherwise.  *Id.*; *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004)

("Our unwillingness to soften the import of Congress's chosen words even if we believe

the words lead to a harsh outcome is longstanding.").

However, adopting ASW's proposed interpretation that "or related" refers to a

CBA does not end the analysis.  The court now turns to the pivotal question in this case:

whether the Special Agreement is related to a CBA.  ASW maintains that the Special

Agreement is not related to a CBA because it itself is not a CBA and the Trust

Agreement is not a CBA.  (*See* Pl. MSJ at 14, 17-18.)  ASW's reading of "related" is too

narrow, and the court concludes that given the circumstances here, the Special Agreement

is related to a CBA.

The term "related" is not defined by the MPPAA.  *See* 29 U.S.C. §§ 1381, 1383,

1392.  Where a term is undefined, courts may follow "the common practice of consulting

dictionary definitions to clarify their ordinary meaning."  *United States v. TRW Rifle*

*7.62X51mm Caliber, One Model 14 Serial 593006*, 447 F.3d 686, 689 (9th Cir. 2006).

"Related" is defined as "connected in some way," "in the same family," or "belonging to

the same group because of shared characteristics, qualities, etc."  *Related*,

Merriam-Webster.com, https://www.merriam-webster.com/dictionary/related (last

accessed Sept. 17, 2021); *see also* Black's Law Dictionary 1158 (5th ed. 1979) (defining

"related" as "to stand in some relation; to have bearing or concern; to pertain; refer; to

bring into association with or connection with").  The Supreme Court and the Ninth

Circuit has recognized that the "ordinary meaning" of "related" is "a broad one."

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992); *see also Pakootas v.*

1 | *Teck Cominco Metals, Ltd.*, 905 F.3d 565, 585 (9th Cir. 2018).  Although the breadth of

2 | "related" "does not mean the sky is the limit," courts have "consistently acknowledged

3 | the . . . broad definition of 'related to.'"  *In re Cummins-Cobb*, No. 2:17-BK-24993-RK,

4 | 2020 WL 634140, at *14 (Bankr. C.D. Cal. Feb. 10, 2020).

5 |  Here, neither party offers authority that is directly on point.  (*See generally* Pl.

6 | MSJ; Defs. MSJ; Arb. Award at 28-29.)  But the broad reach of "related" and the

7 | circumstances here that reveal many connections to CBAs counsel that the Special

8 | Agreement is related to a CBA.  First, the Special Agreement "belong[s] to the same

9 | group" as a CBA "because of shared characteristics, qualities, etc."  *See Related*,

10 | Merriam-Webster.com, https://www.merriam-webster.com/dictionary/related (last

11 | accessed Sept. 17, 2021).  Like a CBA, which is a written agreement between an

12 | employer and a labor organization that lays out the employer's obligation to contribute to

13 | the Trust, the Special Agreement is an agreement between an employer and the Trust that

14 | lays out the employer's obligations to contribute to the Trust.  (*Compare* Trust

15 | Agreement at 1 (defining CBA), *with id.* at 2 (defining special agreement).)  Although the

16 | Special Agreement does not involve the same parties as a CBA, the parallels between the

17 | two documents indicate that they, at the very least, belong "in the same family."  *See*

18 | *Related*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/related

19 | (last accessed Sept. 17, 2021).

20 |  Moreover, it is indisputable that both ASW and the Trust are engaged in collective

21 | bargaining.  The Special Agreement qualifies ASW as an "employer association[]

22 | actively engaged in multi-employer collective bargaining negotiations."  (2008 Special

1   Agreement at 1; 2011 Special Agreement at 1.)  Furthermore, the Special Agreement

2   explicitly refers to the Trust Agreement, the execution of which several senior employees

3   of ASW participated in.  (*Id.*; Arb. Award at 29-30.)  The Trust Agreement governs a

4   "joint labor-management pension benefit trust fund" and involves several "bargaining

5   units" represented by local unions.  (Trust Agreement at v, 9.)  ASW, as a participating

6   employer association, is defined by the Trust Agreement as an association "that is party

7   to a [CBA] with a labor organization."  (*Id.* at 2.)  Indeed, the Trust could not qualify as a

8   multiemployer plan if it were not "maintained pursuant to one or more [CBAs] between

9   one or more employee organizations and more than one employer."  *See* 29 U.S.C.

10  § 1002(37); *see also* Pension Benefit Guaranty Corporation, *Introduction to*

11  *Multiemployer Plans*, https://www.pbgc.gov/prac/multiemployer/introduction-to-

12  multiemployer-plans (last accessed Sept. 17, 2021) (defining multiemployer plan as

13  "collectively bargained plan").[5]  Although the court will not go as far as Arbitrator

14  Shaller did in qualifying the Trust Agreement as a CBA (*see* Arb. Award at 30), it

15  recognizes that the Trust Agreement is enveloped in both CBAs and the collective

16  bargaining process.  Thus, the court agrees with Arbitrator Shaller that "the Special

17  Agreement to which ASW is [a] party exists in a setting that is the product of a [CBA]."

18  (*See id.* at 29-30.)  In totality, these circumstances show that the Special Agreement is

19  related to a CBA.

20  //

---

21        [5] The Pension Benefit Guaranty Corporation is the federal agency created by ERISA
    responsible for interpreting ERISA.  *Penn Cent. Corp. v. W. Conference of Teamsters Pension*
22  *Tr. Fund*, 75 F.3d 529, 534 (9th Cir. 1996).

1    This broad reading of "related" aligns with the limited authority analyzing the

2    issue of whether withdrawal liability should incur.  Those courts have generally adopted

3    broad definitions of the terms at issue to "more carefully implement[] the statute's clear

4    objectives." *Korea Shipping Corp.*, 880 F.2d at 1537 (adopting broad definition of

5    "employer" rather than more narrow definition under common law or dictionary); *see*

6    *also Bowers v. Transportacion Maritima Mexicana, S.A.*, 901 F.2d 258, 262 (2d Cir.

7    1990) (expanding "employer" to cover entities who made payments to fund pursuant to

8    contractual obligations).  In *New Jersey Carpenters Pension Fund v. Housing Authority*

9    *& Urban Development Agency of the City of Atlantic City*, the court went even further; it

10   rejected the employer's argument that its obligation "must solely be evidenced by a

11   [CBA]" and concluded that a sufficient obligation could "arise[] in the context of an array

12   of contractual arrangements, not solely in connection with a [CBA]."[6]  68 F. Supp. 3d

13   545, 563 (D.N.J. 2014).

14       The broad reading of "related" also adheres to the clear objectives of the MPPAA.

15   *See Korea Shipping Corp.*, 880 F.2d at 1537.  The primary purpose of the MPPAA was to

16   protect against the loss of pensions by ensuring the financial integrity of multiemployer

17   pension funds.  *See ILGWU Nat'l. Ret. Fund*, 846 F.2d at 880.  Because employers'

18   withdrawals from these funds threatened the funds' solvency, funds were given "broad

19

20       [6] Unlike the present dispute, *New Jersey Carpenters* did not present an occasion for the
     court to analyze the meaning of "related" as utilized in § 1392(a), as the employer there merely
21   argued that an obligation could only arise from a CBA.  *See* 68 F. Supp. 3d at 563.  In dismissing
     that argument, the court concluded that a contractual obligation, such as general cargo
22   agreements or shipping association agreements, may also suffice even if it had not undergone the
     formalities typical in the collective bargaining context.  *Id.*

1    authority" to assess and collect withdrawal liability.  *Bd. of Trs. of Trucking Emp. of N.J.*

2    *v. Canny*, 900 F. Supp. 583, 588 (N.D.N.Y. 1995).  As the MPPAA's legislative history

3    indicates, the term "obligation to contribute" was intended to apply broadly to "any

4    situation in which an employer has directly or indirectly agreed to make contributions,"

5    including "cases in which the employer agreed to be bound by an association agreement."

6    (Lash Decl. ¶ 14, Ex. 13 at 2 (quoting 126 Cong. Rec. 11672 (1980)).)

7         In sum, the court concludes that "or related" as used in § 1392(a) requires that a

8    qualifying agreement is related to a CBA to establish an obligation to contribute.  The

9    court further concludes that the totality of the circumstances here reveal that the Special

10   Agreement, which laid out ASW's obligation to contribute to the Trust, is related to a

11   CBA.  This broad reading of "related" comports with not only the plain language of the

12   statute but also the approach other courts have adopted when analyzing withdrawal

13   liability and the stated purpose of the MPPAA.  Accordingly, the court holds that ASW

14   incurred withdrawal liability when it terminated its contributions.

15   **B.    Calculation of HCR**

16        ASW next challenges the Trust's calculation of the HCR, specifically the inclusion

17   of the increased contribution rate pursuant to the rehabilitation plan's Preferred Schedule.

18   (Pl. MSJ at 18-36.)  Defendants maintain that the Trust's inclusion of the rehabilitation

19   contribution rate is correct because it arises from the 2011 Special Agreement that both

20   parties negotiated and signed.  (Defs. MSJ at 23-36.)  The court agrees with Defendants.

21        The HCR calculation concerns several statutory provisions.  Section

22   1399(c)(1)(C)(i) defines the HCR as the "highest contribution rate at which the employer

1    had an obligation to contribute under the plan . . . ." 29 U.S.C. § 1399(c)(1)(C)(i).  Thus,

2    determining the HCR again implicates an "obligation to contribute," which, as relevant

3    here, must "aris[e] . . . under one or more collective bargaining (or related) agreements."

4    *Id.* § 1392(a).  As discussed above, the court finds that the Special Agreements between

5    ASW and the Trust qualifies as a related agreement under this definition.  *See supra*

6    § III.A.  Thus, this issue boils down to whether the rehabilitation contribution rate set out

7    in the Preferred Schedule and adopted by the parties in the 2011 Special Agreement

8    "arises . . . under" that Special Agreement.

9           Again, the court's analysis begins with the statute's plain language.  *See Harris*

10   *Tr.*, 530 U.S. at 254.  The MPPAA does not define "arising," *see* 29 U.S.C. §§ 1392,

11   1399, so the court turns to the dictionary to clarify its meaning, *see TRW Rifle*, 447 F.3d

12   at 689.  "Arise" is defined as "to begin to occur or to exist; to come into being or to

13   attention . . . to originate from a source."  *Arise*, Merriam-Webster.com,

14   https://www.merriam-webster.com/dictionary/arise (last accessed Sept. 21, 2021).  In the

15   Ninth Circuit, "arise" has been understood to mean "originating from, having its origin

16   in, growing out of or flowing from."  *United States ex rel. Welch v. My Left Foot*

17   *Children's Therapy, LLC*, 871 F.3d 791, 798 (9th Cir. 2017); *see also Trs. of W. States*

18   *Office & Pro. Emps. Pension Fund v. Welfare & Pension Admin. Serv., Inc.*, No. 3:19-cv-

19   00811-SB, 2020 WL 2545315, at *5-6 (D. Or. May 19, 2020) ("*WPAS*") (describing

20   similar definitions of "arise," such as "come into being," "originate," and "spring up").

21          Only one court has interpreted whether rehabilitation contribution rates adopted in

22   a CBA or related agreement "arises" under that agreement.  *See WSOPE*, 506 F. Supp. 3d

at 1085-86 (qualifying issue as "question of first impression in the Ninth Circuit").

*WSOPE* presents almost identical facts.[7]  *See id.* at 1081-81.  There, the pension fund

entered critical status and alerted all bargaining parties of a rehabilitation plan that

included two contribution schedules, one of which was designated the default schedule.

*Id.* at 1081.  Afterwards, the employers adopted a new CBA where they "agreed to make

supplemental contributions in order to contribute at a rate consistent with those published

. . . in furtherance of the rehabilitation plan."  *Id.*  When the fund included the

rehabilitation contribution rate in its HCR calculations upon the employers' withdrawal,

the employers initiated arbitration.  *Id.*  The employers, like ASW does here, maintained

that the rehabilitation contribution rates could not have arose from the CBA because they

were "never subject to 'negotiation'" and there was "no opportunity to bargain over the

level of rates."  *Id.* at 1085; (*see* Pl. MSJ at 21-24.)

   The court rejected the employer's argument and concluded that a "rehabilitation

contribution rate adopted in a CBA . . . 'originates from' those negotiations, and thus

from the CBA."  *WSOPE*, 506 F. Supp. 3d at 1086.  The court highlighted the many

statutory provisions that show how "the inclusion of a given rehabilitation contribution

rate *is* subject to negotiation."  *Id.* at 1085 (emphasis in original).  For instance,

§ 1085(e)(3)(A) explains that a rehabilitation plan merely sets out "a range of options ***to

be proposed*** to the bargaining parties" and only executed "***if agreed to*** by the bargaining

parties."  *Id.* (emphasis in original.)  Moreover, § 1085(e)(1)(B)(i) states that the various

---

  [7] *WSOPE* concerned appeals of two arbitration awards that had reached opposite conclusions on this issue.  506 F. Supp. 2d at 1080.

1    rehabilitation schedules, "if adopted" by the bargaining parties, should help the fund

2    emerge from critical status.  *Id.*  Section 1085(e)(3)(C) even provides for the situation

3    where bargaining parties "***fail to adopt***" a rehabilitation schedule, thus illustrating that the

4    statute "anticipates that [employers] might *not choose* to adopt a plan sponsor-provided

5    schedule." *Id.* at 1085-86 (emphasis in original).  After reviewing the statutory language,

6    the court concluded that the text of § 1085(e) "demonstrates that the parties have choices

7    and that the inclusion of rehabilitation contribution rates in a CBA is subject to

8    bargaining." *Id.* at 1086.

9            The same is true for the rehabilitation contribution rate that ASW adopted into its

10   2011 Special Agreement with the Trust.  After the Trust presented the statutorily-required

11   options to ASW, the statute gave ASW the choice between the two schedules; to not

12   adopt any schedule; or to exit the plan to avoid the rehabilitation contribution rates

13   altogether.  *See* 29 U.S.C. § 1085(e); *WSOPE*, 506 F. Supp. 3d at 1088-89 (laying out

14   "several options" employer had under § 1085(e)); (*see* Rehab. Plan at 1-2.)  Other courts

15   have characterized this decision-making process as a negotiation where employers

16   ultimately have the say in choosing which rates to adopt.  *See, e.g.*, *Honerkamp*, 692 F.3d

17   at 132 (summarizing how "rehabilitation plan would figure prominently in any

18   negotiations" and describing how parties "considered the rehabilitation plan's schedules

19   as well as the possibility of . . . withdrawal" in negotiating subsequent CBA).  Indeed, no

20   change in rates was instituted simply upon the Trust's presentation of the rehabilitation

21   plan; until ASW chose the Preferred Schedule rates, as reflected in its 2011 Special

22   Agreement, those rates did not "begin to occur." *See Arise*, Merriam-Webster.com,

1    https://www.merriam-webster.com/dictionary/arise (last accessed Sept. 21, 2021); (*see*

2    *generally* Rehab. Plan.)  In other words, the rehabilitation contribution rates "originated

3    from" or "grew out of" ASW's decision making process leading up to the 2011 Special

4    Agreement.[8]  (*See* Pl. MSJ at 21-23.)

5          ASW's other arguments regarding its supposed lack of choice fare no better.

6    ASW points to a portion of the title of § 1085(e)—"Rehabilitation plan *must be adopted*

7    . . ."—as an indication of its lack of input.  (Pl. MSJ at 24 (emphasis in original).)  But

8    the requirement that the fund put together a rehabilitation plan with various options does

9    not undercut the subsequent choice employers have in deciding which of the schedules,

10   and in turn, which of the rehabilitation contribution rates, to adopt.  *See* 29 U.S.C.

11   § 1085(e)(1)(B) (describing choice given to employers after adoption of rehabilitation

12   plan).  Moreover, ASW's assertions regarding "bargaining parties" is unavailing.  ASW

13   states that the definition of "bargaining parties" "expressly excludes the [Trust]" and that

14   "here there were no 'bargaining parties.'"  (Pl. MSJ at 25.)  The former statement is true

15   but of no consequence:  Bargaining parties are those who have an obligation to contribute

16   to the plan, which of course does not include the plan itself.  The latter statement is

17   plainly incorrect.  For employers, such as ASW, who contribute with respect to

18   employees not covered by a CBA, the statute treats them "as if the employer were the

19   bargaining party."  29 U.S.C. § 1085(i)(2).  Thus, there were bargaining parties here.

20   //

21

22   ───────────

     [8] This conclusion aligns with the vast majority of arbitration decisions to have considered
     the issue.  (*See* Lash. Decl. ¶¶ 17-21, Exs. 16-20 (collecting arbitration decisions in favor of
     pension funds on issue).)

1        Nor does interpreting the rehabilitation contribution rate as arising from the

2   Special Agreement lead to absurd results, as ASW contends.  (*See* Pl. MSJ at 24-25.)

3   ASW lays out a specific hypothetical, where the plan presents only one schedule, and

4   laments that those who choose not to incorporate that schedule into its CBA would have

5   it imposed as a default schedule but would not incur the rehabilitation contribution rate in

6   its withdrawal liability calculations.  (*See id.*)  The court is neither persuaded that such a

7   particular hypothetical is likely to occur with any regularity—ASW provides no

8   indication it does (*see id.*)—nor that its occurrence means that a patently absurd

9   consequence would result from the court's construction.  Moreover, ASW's hypothetical

10  presents several additional questions that are not before the court, such as whether

11  rehabilitation contribution rates imposed through a default schedule should be included in

12  HCR calculations or whether rehabilitation contribution rates that were not adopted in a

13  CBA or related agreement should factor into HCR calculations.  *See WSOPE*, 506 F.

14  Supp. 3d at 1087-88 (distinguishing between cases involving default schedules and those

15  with a rehabilitation contribution rate expressly adopted in a CBA).  Thus, the court finds

16  ASW's concern inapplicable and overblown.

17        In support of its position, ASW relies upon a line of cases analyzing the automatic

18  surcharges that occur during critical status, all of which held that the surcharges arose

19  under statute rather than a CBA or related agreement.  (Pl. MSJ at 19-23.)  But, as the

20  *WSOPE* court explained, those cases analyzing automatic surcharges are "distinguishable

21  on multiple grounds."  506 F. Supp. 3d at 1086-87.  First and foremost, the surcharge is a

22  payment mandated by the PPA that occurs automatically upon a fund's entering critical

1   status.  *See Bd. of Trs. of IBT Local 863 Pension Fund v. C&S Wholesale Grocers, Inc.*,

2   802 F.3d 534, 545 (3d Cir. 2015); *WPAS*, 2020 WL 2545315, at *6 (concluding that

3   surcharge arises under PPA because it is automatically incurred when necessary

4   conditions are met).  Not so with the rehabilitation contribution rate, which allows the

5   bargaining parties to choose and agree on which, if any, of the proposals within the

6   rehabilitation plan to adopt.  *See* 29 U.S.C. §§ 1085(e)(1)(B), 1085(e)(3); *see WSOPE*,

7   506 F. Supp. 3d at 1086-87 ("Unlike with the statutorily mandated surcharge, the parties

8   . . . could have included the rehabilitation contribution rate within the CBA, not included

9   it and accepted the default rate, or withdrawn from the [plan].").  Second, the surcharge is

10  based on a percentage of the employer's contributions, which courts concluded did not fit

11  into the ordinary meaning of "contribution rate."  *WPAS*, 2020 WL 2545315, at *6-8;

12  *C&S*, 802 F.3d at 544; (*see* Pl. MSJ at 31-33 (making same argument).)  But a

13  rehabilitation contribution rate is undoubtedly a contribution rate.  *See WSOPE*, 506 F.

14  Supp. 3d at 1086.

15       Finally, rehabilitation contribution rates do not share the same concern as

16  surcharges did about rendering statutory provisions superfluous.  *See id.* at 1087.  ERISA

17  has always had an enforcement section, § 1145, that governs delinquent contributions and

18  describes "the employer's contractual obligation to make contributions but omits any

19  reference to a noncontractual obligation."  *Laborers Health & Welfare Tr. Fund for N.*

20  *Cal. v. Adv. Lightweight Concrete Co., Inc.*, 484 U.S. 539, 546 (1988); 29 U.S.C. § 1145.

21  Regarding surcharges, Congress added an enforcement clause, § 1085(e)(7)(B), that

22  provides the "failure to pay a surcharge shall be treated as a delinquent contribution under

1 § 1145." 29 U.S.C. § 1085(e)(7)(B).  The surcharge cases reasoned that if surcharges

2 arose from CBAs or other contractual agreements, it would render § 1085(e)(7)(B)

3 "redundant and meaningless," as such contributions would have already been covered by

4 § 1145.  *C&S*, 802 F.3d at 543-44.

5       ASW makes a similar argument regarding § 1085(e)(3)(C)(iv), the enforcement

6 provision governing rehabilitation plan payments that states, "[a]ny failure to make a

7 contribution under a schedule of contribution rates provided under this subsection shall

8 be treated as a delinquent contribution under [§] 1145."  (*See* Pl. MSJ at 25-30); 29

9 U.S.C. § 1085(e)(3)(C)(iv).  But as the *WSOPE* court explained, "unlike the automatic

10 surcharge, there are multiple rehabilitation schedules," both contractual and

11 noncontractual.  506 F. Supp. 3d at 1087.  For instance, § 1085(e)(3)(C)—the very

12 subsection where the enforcement provision is found—contemplates a noncontractual

13 situation:  when the bargaining parties "fail to adopt a contribution schedule," causing the

14 default schedule to be implemented by law.  *See* 29 U.S.C. § 1085(e)(3)(C)(i)-(ii).  A

15 contractual obligation to contribute under a rehabilitation plan, such as when the

16 bargaining party adopts a rehabilitation contribution rate in its CBA or related agreement,

17 is undoubtedly already covered by § 1145.  But noncontractual rehabilitation contribution

18 rates, such as the default contribution rates imposed by law when no schedule is adopted,

19 would not have been covered by § 1145; section 1085(e)(3)(C)(iv) remains necessary to

20 enforce those noncontractual obligations.  *See WSOPE*, 506 F. Supp. 3d at 1089-90.

21       ASW challenges the *WSOPE* court's reasoning by contending that the term

22 "subsection" as used in § 1085(e)(3)(C)(iv) refers to all of § 1085(e) and thus apply to all

1    rehabilitation plan payments.  (Pl. MSJ at 28-29.)  But interpreting "subsection" as ASW

2    proposes would expand § 1085(e)(3)(C)(iv)'s enforcement reach to surcharges, which are

3    discussed in § 1085(e)(7).  That cannot be, as § 1085(e)(7) has its own enforcement

4    provision at § 1085(e)(7)(B).  Moreover, the court observes that § 1085 commonly

5    utilizes "subsection" to refer to the third sublevel of headings.  *See, e.g.*, 29 U.S.C.

6    § 1085(e)(8)(A)(ii) (referring to "subsection (b)(3)(D)").  Applied here, then, the

7    "subsection" in § 1085(e)(3)(C)(iv) would be referring to § 1085(e)(3)(C).  Because

8    § 1085(e)(3)(C)(iv) governs noncontractual rehabilitation plan payments, the court rejects

9    ASW's argument that reading rehabilitation plan payments to arise under CBAs or

10   related agreements would render § 1085(e)(3)(C)(iv) superfluous.  In sum, the court

11   agrees with the *WSOPE* court that the authorities analyzing surcharges are

12   distinguishable and inapplicable here.

13         Finally, ASW argues that the subsequently-passed MPRA and its amendment

14   excluding any rehabilitation contribution rates from HCR calculations merely clarified

15   the law, and thus, the PPA never meant for rehabilitation contribution rates to be included

16   in HCR calculations.  (Pl. MSJ at 33-36.)  The court follows the lead of many courts to

17   have encountered this argument and declines to utilize "the views of a subsequent

18   Congress [to] form a . . . basis for inferring the intent of an earlier one."  *E.g.*, *C&S*, 802

19   F.3d at 546 (quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S.

20   102, 117 (1980)) (internal quotation marks omitted).  The *C&S* court determined "it

21   would be a hazardous venture . . . to draw any conclusions from the enactment of the

22   MPRA" due to "the dearth of legislative history for the MPRA and lack of clear statutory

1    language." 802 F.2d at 546.  The *WPAS* court similarly "decline[d] to draw any

2    conclusions about the proper interpretation of then-existing law at the time Congress

3    enacted the MPRA." 2020 WL 2545315, at *9.  And the *WSOPE* court noted "[t]here is

4    no need to wade into legislative history arguments" about the MPRA because the

5    "statutory scheme as written before the 2014 amendment is coherent and consistent, and

6    the statutory language is unambiguous." 506 F. Supp. 3d at 1090.  The court agrees with

7    *C&S*, *WPAS*, and *WSOPE* on this issue and similarly finds no reason to embark on such a

8    "hazardous venture."  *C&S*, 802 F.2d at 546.

9           In sum, the court is unpersuaded by ASW's various arguments why the

10   rehabilitation contribution rates here arise from the PPA.  Because the court finds that the

11   higher contribution rates set out in the Preferred Schedule and adopted by ASW in its

12   2011 Special Agreement arose from that Special Agreement, the court holds that they

13   were properly included in the HCR for withdrawal liability calculations.

14                            **IV.   CONCLUSION**

15          For the foregoing reasons, the court DENIES ASW's motion for summary

16   judgment (Dkt. # 14) and GRANTS the Trust's cross motion for summary judgment

17   (Dkt. #12).

18          Dated this 24th day of September, 2021.

19

20                                                    _____

21                                                    JAMES L. ROBART
                                                      United States District Judge

22

ORDER - 27